# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MELISSA D. MATTIS,** | )    **NO. EDCV 17-0724-KS** |
| **Plaintiff,** | ) |
| **v.** | )    **MEMORANDUM OPINION AND ORDER** |
| | ) |
| **NANCY A. BERRYHILL**, Acting | ) |
| **Commissioner of Social Security,** | ) |
| **Defendant.** | ) |
| _____ | ) |

## INTRODUCTION

Melissa Mattis ("Plaintiff") filed a Complaint on April 15, 2017, seeking review of the denial of her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Dkt. No. 1.) On May 22, 2017, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned United States Magistrate Judge. (Dkt. Nos. 11, 12, 13.) On December 5, 2017, the parties filed a Joint Stipulation ("Joint Stip."). (Dkt. No. 19.) Plaintiff seeks an order reversing the Commissioner's decision and remanding for an immediate award of benefits or, alternatively, for further proceedings. (Joint Stip. at 23.) The Commissioner requests that the ALJ's decision be affirmed or, in the alternative, be remanded for further proceedings. (Joint Stip. at 23-

1

24.) The Court has taken the matter under submission without oral argument and remands the case for further proceedings.

## SUMMARY OF ADMINISTRATIVE PROCEEDINGS

On February 7, 2014, Plaintiff, who was born on April 26, 1974, filed an application for DIB under Title II and Part A of Title XVIII.[1]  (Administrative Record ("AR") 202-03.) On March 13, 2014, Plaintiff filed an application for SSI under Title XVI.  (AR 204-11.) Plaintiff alleged disability beginning July 13, 2011 due to back injury, depression, and bipolar disorder.  (AR 212, 215.)  The Commissioner denied Plaintiff's concurrent DIB and SSI applications initially on May 9, 2014 and upon reconsideration on August 29, 2014. (AR 67, 68, 128, 129.)  Plaintiff then requested a hearing. (AR 151).  Administrative Law Judge Joseph D. Schloss ("ALJ") held a hearing on July 1, 2015.  (AR 40-66.)  Plaintiff, represented by counsel, testified before the ALJ, as did medical expert ("ME") Eric Schmitter, and vocational expert ("VE") Katy Macy-Powers.  (*Id.*)  On August 10, 2015, the ALJ issued an unfavorable decision, denying Plaintiff's applications.  (AR 20-39.)  On February 16, 2017, the Appeals Council denied Plaintiff's request for review.  (AR 1-6.) Plaintiff timely filed this Complaint.

## SUMMARY OF ADMINISTRATIVE DECISION

The ALJ found that Plaintiff met the insured status requirements through June 30, 2014.  (AR 25.)  Then, applying the five step sequential disability evaluation process, at Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 13, 2011, the alleged onset date of disability.  (AR 25.)  At Step Two, the ALJ found that Plaintiff had two severe impairments: degenerative disc disease and obesity.  (AR 26.)  At

---

[1]  Plaintiff was 39 years old on the application date and thus met the agency's definition of a "younger individual." *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).

Step Three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any impairments listed in 20 C.F.R. part 404, subpart P, appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926). (AR 27.) The ALJ then determined that Plaintiff had the residual functional capacity ("RFC") to perform light work with the following limitations:

> "[Plaintiff] can lift and/or carry 20 pounds occasionally and 10 pounds or less frequently; she can sit, stand and/or walk for eight hours out of an eight-hour workday with the option to change position at the work station once an hour; she cannot climb ladders, ropes, or scaffolds; she can climb ramps and stairs; she can frequently balance, stoop, kneel, crouch, and crawl; she must avoid concentrated exposure to extreme cold, unprotected heights, and unprotected machinery; she cannot work with vibrations or vibratory tools or instruments."

(AR 28.)

At Step Four, the ALJ found that Plaintiff could perform her past relevant work as a data entry clerk (DOT[2] 203.582-054) and as a general office clerk (DOT 219.362-010) based on the testimony of the VE. (AR 34.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from the alleged disability onset date through the date of the ALJ's decision and did not reach Step Five. (AR 34-35.)

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence in the

---

[2] "DOT" refers to the Dictionary of Occupational Titles.

3

record as a whole. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (citations omitted). "Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

Although this Court cannot substitute its discretion for the Commissioner's, the Court nonetheless must review "the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (citations omitted); *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citations omitted).

The Court will uphold the Commissioner's decision when "the evidence is susceptible to more than one rational interpretation." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). However, the Court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." *Orn*, 495 F.3d at 630; *see also Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). The Court will not reverse the Commissioner's decision if it is based on harmless error, meaning error that is "inconsequential to the ultimate nondisability determination, or that, despite the legal error, the agency's path may reasonably be discerned." *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (citations omitted).

\\
\\
\\

4

**DISCUSSION**

The parties raise a single issue: whether the ALJ properly evaluated Plaintiff's subjective symptom testimony.  (Joint Stip. at 4.)  The Court finds the issue warrants reversal and remands for further administrative proceedings.

I.      **The ALJ Erred in Discounting Plaintiff's Credibility Concerning the Severity of Her Symptoms**

Plaintiff contends the ALJ failed to provide legally sufficient reasons to reject Plaintiff's credibility concerning her physical symptoms and limitations.[3]  (Joint Stip. at 4-14.)  For the reasons discussed below, the Court agrees.

   **A. Plaintiff's Medical History**

In 2005, Plaintiff went to the Emergency Room ("ER") on February 22, 25, and 27 complaining of back and leg pain.  (AR 426, 438, 451.)  An x-ray taken on February 27 revealed no findings.  (AR 457.)  On March 8, Plaintiff was admitted to the hospital.  (AR 466.) On March 9, 2005, Doctor Brett Abshire, M.D., examined Plaintiff.  (AR 483.) Plaintiff reported that in September of the previous year, she lifted her child and then started experiencing lower back and leg pain.  (AR 483.)  She received epidural steroid injections and went to physical therapy.  (AR 483.)  In January, she was able to return to work.  (AR 483.)  On February 22, 2005, Plaintiff was involved in a car accident.  (AR 483.)  Within three days, she experienced an increase in her back and left leg pain such that she became

---

[3]      Plaintiff alleged disability resulting from back injury, depression, and bipolar disorder.  (AR 212, 215.)  The ALJ found Plaintiff only had severe impairments relating to degenerative disc disease and obesity.  (AR 26.)  Plaintiff stipulated to the ALJ's summary of the record except as to the issues raised in the Joint Stipulation, which only addresses Plaintiff's physical symptoms.  (Joint Stip. at 4-14.)  Thus, the Court will not address Plaintiff's alleged mental impairments.

"progressively incapacitated and unable to ambulate, secondary to severe left leg pain in an S1 distribution." (AR 483.) The pain extended to her left leg, left foot, and into the lateral aspect of her left foot. (AR 483.) Sitting, standing, and walking too long made the pain worse while lying down made it slightly better, but the pain had become unbearable. (AR 483.) To rule out Deep Vein Thrombosis ("DVT") as the cause for Plaintiff's leg pain, Dr. Abshire ordered an ultrasound. (AR 483.) The ultrasound showed no evidence of DVT in her legs. (AR 529.)

Upon examination, Dr. Abshire found Plaintiff had 3 out of 5 weakness in her left gastrocnemius muscle and no left ankle reflex. (AR 483.) She had a positive straight leg raise test. (AR 483.) Palpation of her left calf revealed tenderness but her other motor strength and deep tendon reflexes were normal. (AR 483.) Sensory examination showed she had "slight decrease in sensation to light touch in an S1 distribution on the left." (AR 483.) Plaintiff also reported that she experienced "burning pain" in her left leg. (AR 484.) An MRI showed she had a "large left-sided L5-S1 herniation, compressing the left S1 nerve root." (AR 483.) Dr. Abshire recommended surgery but warned Plaintiff there were risks, including intractable back pain and continuing leg pain. (AR 484.)

On March 10, 2005, Plaintiff underwent her first back surgery. (AR 489.) Dr. Abshire performed a left L5-S1 microdiskectomy. (AR 484.) During the procedure, Dr. Abshire removed "a large L5-S1 disk herniation" and also noted Plaintiff had "a fairly large L5-S1 posterior osteophyte." (AR 489.) After the disk fragment was removed, "a large annular disk tear and defect in the annulus measuring approximately 5mm in diameter" was seen. (AR 489.) The osteophyte was drilled down "creating more room for the S1 nerve root." (AR 489.) Plaintiff was discharged on March 12, 2005 with the plan that she would attend outpatient physical therapy. (AR 471.)

\\
\\

On January 12, 2011, Plaintiff received a physical assessment by Physician Assistant ("PA") Brett Grundl. Plaintiff reported she hurt her lower back three weeks prior picking up bags of dog food and experienced pain "24/7" she rated as 7 out of 10 and stated it was worse when she sat. (AR 361.) PA Grundl commented Plaintiff had lumbar spine pain that radiated down her left leg and that she had positive straight leg raise tests in both legs at 30 degrees. (AR 361.) He ordered an x-ray and prescribed pain medication. (AR 361.)

On January 13, 2011, Plaintiff underwent an x-ray. (AR 369.) The x-ray included five views and showed "moderately severe narrowing of the L5-S1 disc space and moderate narrowing of the L4-5 disc" but "no fracture or lytic process." (AR 369.)

On January 18, 2011, Plaintiff received a physical assessment by PA Grundl. (AR 356.) Plaintiff reported going to ER because of lower back pain that also radiated down her left leg. (*Id.*) Plaintiff's treatment record noted she received Vicodin and Prednisone, her lumbar x-rays showed narrowed discs at L4-5 and L5-S1, and it appears Plaintiff had positive straight leg raise tests in both legs at 20 degrees. (AR 356.) An MRI was ordered. (AR 356.)

On January 28, 2011, Plaintiff underwent an MRI. (AR 367.) The MRI showed Plaintiff had "9mm of posterior paracentral disc herniation causing mild spinal canal stenosis and moderate left lateral recess stenosis" at the L4-5 level. (AR 367.) It also revealed "8mm of posterior left-sided disc herniation causing severe left lateral recess stenosis, moderate left foraminal stenosis, and mild right foraminal stenosis" at the L5-S1 level. (AR 368.)

On February 9, 2011, Plaintiff received a physical assessment by PA Grundl. He noted Plaintiff's lower back pain had not improved and her pain medication only helped "somewhat." (AR 353.) He commented Plaintiff's MRI's showed herniated discs at L4-5 and L5-S1 and that she had spine pain that radiated down her left leg. (AR 353.) He referred her to a spine specialist and continued her pain medication. (AR 353.) On March 21, 2011,

Plaintiff asked about the status of her referral to a spine specialist. (AR 354.) The clinic resent all of her documents to the spine specialist and confirmed they were received. (AR 354.)

On April 6, 2011, Plaintiff received a physical assessment by PA Grundl for a follow up on spine pain. (AR 352.) PA Grundl noted Plaintiff was "still waiting for an [appointment]" and her back pain was worsening. (AR 352.) He re-referred her to a spine specialist and refilled her prescriptions. (AR 352.)

On May 2, 2011, Plaintiff saw Doctor Gail E. Hopkins, M.D. (AR 317.) She complained of low back pain and left leg pain that began five months prior when she picked up a bag of dog food. (AR 317.) Dr. Hopkins reported: "The pain is aggravated by sitting down and alleviated by lying down or standing. The pain does radiate into her left leg and foot. The back pain is less than the leg pain, with associated numbness, tingling and weakness. Treatment to date has included pain medication." (AR 317.) Plaintiff measured 5 feet 6 inches tall and weighed 200 pounds. (AR 317.) Dr. Hopkins noted: "The patient has moderate difficulty transferring from the chair to standing and from standing to the exam table." (AR 318.) Palpation of Plaintiff's back revealed only "some minimal tenderness" but no adenopathy. (AR 318.) Palpation of Plaintiff's legs and arms did not reveal any tenderness. (AR 318.) Dr. Hopkins noted Plaintiff's lumbar range of motion was 75% of normal and her bilateral leg range of motion was 100%. (AR 318.) Dr. Hopkins also included: "Range of motion is reported for completeness sake but is not an objective measure and an inaccurate predictor of disability." (AR 318.) Plaintiff had a mildly positive straight leg raise test for her left leg but the Spurling's maneuver test was negative. (AR 318.)

Next, Dr. Hopkins reviewed Plaintiff's MRI. (AR 319.) He observed evidence of Plaintiff's "previous L5-S1 laminotomy with the residual disc herniation on the left at this level as well as a new disc herniation likely at L4-5 on the central and left region." (AR 319.)

Dr. Hopkins diagnosed Plaintiff with "lumbar disk desiccation at L4-5 with probable recurrent disc herniation L5-S1." (AR 319.) Dr. Hopkins noted that Plaintiff had "failed conservative care" and she had "severe leg pain that is unrelenting" but he did not recommend surgical fusion for back pain. (AR 319.) He noted Plaintiff had three levels of arthritis in her back. (AR 319.) Plaintiff reported she had previously tried epidural injections but they did not help, so she denied Dr. Hopkins' offer to refer her for one. Finally, Dr. Hopkins discussed the risks and benefits of surgery and told Plaintiff, "there is a higher risk in this situation for a Dural tear due to the previous surgical intervention at L5-S1." (AR 319.)

On July 13, 2011, Plaintiff underwent her second back surgery. (AR 639.) Dr. Hopkins performed a left-sided laminectomy and diskectomy at the L4-5 level and a revision diskectomy at the L5-S1 level. (AR 639.) Dr. Hopkins' operation report included the following:

> After exposing the spine, localizing x-rays, a laminotomy was then taken of the inferior aspect of L4. The ligamentum flavum was elevated off the superior aspect of L5 and removed in its entirety at this level. The nerve root was not mobile, was very carefully slowly mobilized for excision of this fairly large disk fragment, extended and was mildly calcified but extended fairly high from the left-sided paracentral region. This was removed in its entirety after being identified, incised with the #15 blade. The loose disk fragments were removed from inside the disk space with pituitary rongeur. Following completion of the decompression at this level attention was paid to the revision level. It was very difficult to enter the revision level as there was extensive amount of scar tissue. The nerve root actually extended up out of the spinal canal due to the large persistent disc herniation she had, the nerve root was very carefully mobilized with a fairly extensive amount of difficulty but was retracted and mobilized and

the underlying disk fragment was noted to be completely calcified. It was removed as best as could be with pituitary rongeurs and Kerrison rongeurs but it could not be completely removed due to the extensive amount of scarring and extensive amount of calcification in this disk. It has likely been present since the last decompression or very near thereabouts. At the completion of the decompression the nerve was freely mobile but there was still a large significant amount of disk material that had been calcified that was left in position due to worries of injury in the nerve roots with continued manipulation and excision of these calcifications.

(AR 639-40.)

On July 15, 2011, two days after the surgery, Plaintiff went to the ER. (AR 298.) She reported that "earlier tonight she went to the restroom and when she went to wipe herself, she had acute onset of some pain to her left leg." (AR 298.) When she was examined, her Achilles' reflex on the left "was essentially absent." (AR 298.) She also had "some areas of some slight decreased sensation subjectively, in a non-dermatomal distribution, in the medial and lateral calf." (AR 298.) But she was ambulatory after receiving pain medication, she had no deficits in her hip flexion, foot flexion, dorsiflexion, or toe extension, and her patellar tendon reflex was normal. (AR 298.) Her doctor was unreachable at the time and the doctor on call for her doctor never responded to the ER's pages, so after her pain was under control she was released to go home. (AR 298.)

On July 16, 2011, Plaintiff was admitted to the hospital for recurrent leg pain after her diskectomy. (AR 274.) Prior to being admitted, she "had returned multiple times for leg pain." (AR 274.) She underwent a "Doppler Venous Unilat" which showed "[n]egative left lower extremity venous Doppler sonography" and "[n]o deep venous thrombosis." (AR 280.) Plaintiff also underwent an MRI of the lumbosacral spine which revealed an "8mm posterior

protrusion… thought to be disk material to the left at L5-S1." (AR 280.) Another protrusion of 3 to 4 mm was also seen at the L4-L5 level. (AR 280.) She received oral and IV pain medications but improved slowly and was not discharged until July 20, 2011. (AR 274.)

On July 28, 2011, Plaintiff complained of "sharp and aching pain rating 7 out of 10 in the low back radiating down the left leg." (AR 324.) She also reported that her pain was "worsened with sitting or walking and relieved with lying down." (AR 324.)

On August 1, 2011, Plaintiff reported her pain was the same and also requested medication for her stomach. (AR 326.) Dr. Hopkins noted Plaintiff's incision was healing well, that her spine was well aligned, that muscle strength in her legs was normal, and her sensation was normal. (AR 326.) Despite this, Dr. Hopkins wrote as follows:

> She continues to have significant pain in the distribution of the nerve from her previous surgery. The discectomy of the new disc herniation at L4-5 has shown do have a complete excision of this fragment. There is no ongoing compression at the acute level but her chronic nerve compression and nerve dysfunction is significant. The only intervention that could help take more pressure off this nerve where the calcified previous disc fragment was present is to proceed with a posterior lumbar interbody fusion at L5-S1. I've told her this may not cure the dysfunction of this chronically irritated nerve that was scarred into the calcified disc herniation. She states that she understands this but cannot live without attempting further decompression. We will proceed as such. I've given her a prescription for Pepcid today.

(AR 326.)

\\

\\

11

On September 1, 2011, the hospital admitted Plaintiff for her third back surgery. (AR 304.) Dr. Hopkins performed the surgery. (AR 307.) Dr. Hopkins' preoperative and postoperative diagnosis was the same – "residual disk herniation to the left at L5-S1 from previous surgery with persistent radiculopathy." (AR 307.) Plaintiff's surgery included: (1) revision laminectomy, L5-S1; (2) revision diskectomy, L5-S1; (3) posterior lumbar interbody fusion, L5-S1; (4) posterior spinal instrumentation, L5-S1; (5) posterior spinal fusion, L5-S1; (6) autograft, local; and (7) intervertebral device placement at L5-S1. (AR 307.)

Dr. Hopkins' operative report read in pertinent part as follows:

Patient is status post-surgery from previous physician approximately five to seven years ago at L5-S1 where laminotomy was undertaken and decompression was undertaken. Patient had disk fragment apparently still in position. Whether this is recurrent disk herniation or just persistent existence of the disk herniation from the previous decompression is unclear, but she continues to have significant radiculopathy. Patient was brought back to the operating room approximately a month-and-a-half to two months ago for L4-L5 diskectomy. The L4-L5 diskectomy was completely removed, but the patient had worsening and persistence of this leg pain in the L5-S1 distribution. Decision was made to proceed for complete decompression which requires facetectomy and screws which she did not desire in the first surgery…

… It is of note that there was partial chronic removal of the facet capsule on the left at L4-L5, but it was not a complete facet capsule removal. It was chronic in nature and I do not think obligates the need for extending the fusion to L4-L5…

… A complete laminectomy was undertaken of L5 in the inferior three-quarters of the lamina… There was extensive amount of scarring and very scarred and

adherent nerve root in the S1 distribution traversing this disk herniation. An osteotome was used to osteotomize the facet, both superior and inferior facet on the left at L5-S1. These were removed and the underlying nerve was extremely erythematous, and irritable, and smashed. Unroofing over it was undertaken and then very carefully the S1 and L5 nerve roots were mobilized off of an extremely scarred area at the L5-S1 disk space…

After mobilization of the nerves, the disk fragment that was residual was begun to be removed. It was removed as best as possible, but there was essentially solid bony encasement of the entire disk fragment… As much of the disk that was safe was removed from underneath the nerve root… and then the disk in between the L5-S1 level was removed in its entirety…

… The autograft bone that was saved from the laminectomy was packed into a cage and in the anterior interspace after it was osteotomized. The bone graft was packed into the anterior interspace. The cage was placed, it was impacted in with care to protect the nerve roots throughout the duration of this procedure…

… It is of note that DuraSeal was used overlying the dura even though there is no CSF leak secondary to the extreme scarring of the dura and concerns of possible unseen dural tear.

(AR 307-09.)

Fluoroscopic spot films of two views of her lower lumber and upper sacral spine were then taken. (AR 292.) The images showed the newly inserted hardware and even after surgery, they showed "mild posterior and anterior osteophyte formation" at the L5-S1 disk where she had the bone graft plug. (AR 292.) She did well during the procedure but

13

experienced "significant difficulties with postoperative pain." (AR 304.) Plaintiff received a lot of pain medication, mobilized well, cleared physical therapy, and although she was still experiencing pain issues, she was discharged on September 8, 2011. (AR 304.) Her surgeon indicated he would provide Plaintiff with a pain management referral "on an outpatient basis regarding her need for persistent narcotics." (AR 305.)

On September 13, 2011, Plaintiff reported still experiencing "7-8 out of 10 pain in the low back." (AR 331.) Dr. Hopkins again listed Plaintiff's incision was healing well, her spine was well aligned, her muscle strength in her legs was normal, and her sensation was intact. (AR 331.) Dr. Hopkins reiterated:

> [S]he is doing relatively well but has persistent leg pain. The nerve roots were manipulated quite significantly at the time of surgery. Revision discectomy was extremely difficult and the nerve roots are very erythematous and very scarred into the level of her previous surgery. I discussed this at length with her. We have given her prescription of Percocet today and we'll see her back in 4 weeks with x-rays at that time. We will obtain a pain management consult for her.

(AR 331.)

On September 23, 2011, Plaintiff received a physical assessment by PA Grundl. (AR 351.) PA Grundl commented that Plaintiff had a surgical scar from L3-S1 that was healing well with "no inflammation, tenderness or swelling." (AR 351.) He refilled some of her prescriptions and referred her to pain management. (AR 351.)

On October 20, 2011, Plaintiff went to the Riverside Regional Pain Center and had an initial consultation with Doctor Babar Iqbal, M.D. (AR 599.) She reported experiencing pain for the past ten months that had progressively increased. (AR 599.) She explained it started

initially with picking up a bag of dog food.  (AR 599.)  She informed Dr. Iqbal she had undergone back surgery three times.  (AR 599.)  She described her pain as "a constant dull ache with occasional radiation into the left lower extremity" with "associated numbness, tingling, [and] weakness in the left leg."  (AR 599.)  She stated she could not walk, stand, or sit for long periods of time because it made the pain worse.  (AR 599.)  Upon examination, Plaintiff had tenderness in the lower facet joints of her lumbar spine, her facet loading test was positive, and she had decreased sensation to fine touch in her left leg.  (AR 601.)  Dr. Iqbal diagnosed Plaintiff with lumbar facet arthropathy and radiculitis and suggested trying "lumbar medial branch blocks and transforaminal epidural injections."  (AR 601-03.)

On February 17, 2012, Plaintiff returned to the Riverside Regional Pain Center.  (AR 595.)  Dr. Iqbal observed Plaintiff had tenderness at the lumbar facet joints and her facet loading test was positive.  (AR 595.)  Plaintiff also exhibited spasms of the paraspinal muscles.  (AR 595.)  The lumbar medial branch blocks had helped relieve her pain and so Plaintiff was considered "a good candidate" for radiofrequency lesioning.  (AR 595.)

On February 25, 2013, Plaintiff received a physical assessment by PA Grundl and reported having lumbar back pain "24/7" that was 7 out of 10 for two weeks.  (AR 347.)  She requested a referral to pain management again and was listed to have had previous spinal injections.  (AR 347.)

On February 10, 2014, Plaintiff reported experiencing lumbar pain and pain radiating down her legs "24/7" that was 8 out of 10 for one and a half weeks.  (AR 339.)

On April 3, 2014, Plaintiff reported she was still experiencing lumbar back pain that radiated into her legs "24/7" that was between 6 and 10 out of 10.  (AR 343.)

\\

\\

Plaintiff was referred to physical therapy mid-August 2014.  (AR 610.)  Plaintiff attended physical therapy from September 8, 2014 through October 2, 2014.  (AR 395-407, 413-17.)

On June 8, 2015, Plaintiff underwent an x-ray.  (AR 613, 614.)  The exam was "unremarkable" because it showed no "acute fracture, bone destruction, or subluxation" and the "vertebral height, alignment and disc spaces [were] well-maintained."  (AR 613.)  It listed hardware at the L5-S1 location.  (AR 613.)

An MRI on the same date was more revealing.  The report stated the reason for the exam was because of lower back pain that radiated into the *right* leg and included a history of surgeries in *2013*, but the report did have Plaintiff's name on it.  (AR 614.)  The MRI found a posterior central disc bulge, a possible small annular tear, and moderate ligamentum flavum hypertrophy at the L3-4 level.  (AR 614.)  The neural foramina were not significantly narrowed.  (AR 614.)  The MRI revealed a diffuse disc bulge at the L4-5 level.  (AR 614.)  Superimposed upon the diffuse disc bulge was a broadbase mild posterior central disc bulge.  (AR 614.)  Superimposed upon the broadbase mild posterior central disc bulge was a focal extrusion centrally.  (AR 614.)  There was also ligament flavum, facet hypertrophy, and anterolateral recess attenuation.  (AR 614.)  But spinal stenosis and the neural foraminal narrowing was mild without evidence of impingement.  (AR 614.)  The MRI also showed a "small focal fluid collection posterior to the surgical defect at L5" and "some atrophic changes of the lower paraspinal muscles."  (AR 615, 646.)  There was "a bulge of material posteriorly at L5-S1 of the surgical defect" that was speculated to be either epidural fat or a "small bony flap related to the previous surgery."  (AR 615.)  This bulge of material abutted the "descending S1 nerve roots" but it did not appear to cause impingement.  (AR 615.)

By July 8, 2015, PA Grundl noted that Plaintiff had completed physical therapy but reported it did not help, she had neuropathy in both of her legs, and experienced pain "24/7"

that was between 6 and 10 out of 10.  (AR 653.)  Plaintiff had an appointment with a spine specialist at the same facility she underwent her second and third surgeries scheduled for October 2, 2015.  (AR 651.)

**B.  Hearing Testimony**

The ALJ held a hearing on July 1, 2015.  (AR 40.)  The ME, Dr. Schmitter, testified first.  (AR 43-50.)  Dr. Schmitter received and reviewed Plaintiff's medical records (exhibits 1F through 10F) and had no questions for Plaintiff.  (AR 43.)  The ME acknowledged Plaintiff's back problems but stated he thought Plaintiff's records were lacking evidence of treatment by a physician rather that the physician's assistant.  (AR 44, 46.)

Plaintiff testified at the hearing that she lived with her husband, who works, her seventeen year-old daughter, and six year-old son.  (AR 54.)  She last worked in 2015 doing auto-CAD drafting at home on a freelance basis for an employer who was a friend.  (AR 51, 61.)  Plaintiff testified that she cannot work because she is unable to sit, walk, or stand for a long period of time and because she takes pain medication that makes her tired and can make her lightheaded.  (AR 51-52.)  She further explained she can sit for approximately 30 minutes and can stand for between 30 minutes to an hour.  (AR 55.)  She also said she can only lift around 10 pounds and has difficulty walking up and down stairs.  (AR 55.)  She said stairs are difficult because she has nerve damage in her left leg; it is numb from knee to foot, so she does not have the strength to climb stairs without it exhausting her.  (AR 55.)  In response to the ALJ's question about why no neurological study had been done, Plaintiff testified that her surgeons did not pursue one and explained that her slipped disc resulted in loss of blood flow to the nerve in her leg causing lasting damage.  (AR 56.)  Plaintiff testified that she had not been back to see Dr. Hopkins since 2011.  (AR 56.)

\\
\\

Plaintiff testified to taking 1,000 milligrams of Norco and 350 milligrams of Somas three times a day.  (AR 52.)  Plaintiff said she had done physical therapy but it did not help, rather it made her left leg worse.  (AR 52.)  She said she needed to lie down for between 15 to 20 minutes to take the weight off of her hips and leg approximately every 2 hours for an estimated 2 to 3 hours a day.  (AR 57.)

Plaintiff described her activities during the day.  Plaintiff said she can fold the laundry but cannot put the clothes in the washer or dryer because she is unable to lift the hampers or twist.  (AR 58.)  She does the dishes and cooks, she can do a little dusting and vacuuming until she feels pain bothering her, but she cannot change bed linens or mop.  (AR 58-59.)  Plaintiff said she occasionally attends church on Sundays for a 45 minute service.  (AR 59.)  She also watches her son at Karate practice once a week.  (AR 59.)

When asked why she felt she could not work, she said her inability to sit or stand for very long requires her to get up and move about which employers do not like because it reduces work time and they consider her to be a risk because she has existing back problems and is on medication.  (AR 60.)  Plaintiff informed the ALJ that she had an MRI taken on June 8, 2015 but had not received the results yet and that she was going to be referred to a spine specialist but did not yet have an appointment scheduled.  (AR 52-54, 61-62.)

Lastly, the ALJ questioned the VE, who confirmed that her testimony was consistent with the Dictionary of Occupational Titles ("DOT").  (AR 62.)  The VE classified Plaintiff's past relevant work as home health aide (DOT 354.377-014), a medium exertion level and SVP[4] level 3; nurse assistant (DOT 355.674-014), a medium exertion level and SVP level 4;

---

[4]    SVP refers to "specific vocational preparation" which is a set of classifications used by the DOT and correlates to skill levels found in 20 C.F.R. 404.1568, 416.968.  Social Security Ruling ("SSR") 00-04p, 2000 LEXIS 8 *7-8; 2000 WL 1898704 *3.

data entry clerk (DOT 203.582-054), a sedentary exertion level and SVP level 4; and general office clerk (DOT 219.362-010), a light exertion level and SVP level 4.  (AR 63.)

The ALJ posed one hypothetical to the VE.  (AR 63-64.)  The hypothetical included limitations such that the person could perform light work lifting 20 pounds occasionally and 10 pounds frequently, and could walk, stand, and sit for eight hours out of an eight-hour work day with a minimal position change once an hour.  (AR 63-64.)  There were no limitations regarding ramps, stairs, balancing, stooping, kneeling, crouching, or crawling, but there was a preclusion from ladders, ropes, scaffolds, concentrated exposure to extreme cold, unprotected machinery, unprotected heights, vibrations, and vibratory tools.  (AR 63-64.)  Based on these limitations, the VE testified that the hypothetical person with Plaintiff's educational and work background could perform Plaintiff's past work as a data entry clerk and general office clerk, but not as a home health aide or nurse assistant.  (AR 63-64.)  Plaintiff's attorney had no questions for the VE.  (AR 64.)  The ALJ indicated that he would leave the record open for 30 days to receive Plaintiff's latest MRI and would be willing to give another extension if Plaintiff scheduled an appointment with a specialist.  (AR 64-65.)

### C.  ALJ's Credibility Determination

The ALJ found Plaintiff had two severe impairments: degenerative disc disease and obesity.  (AR 26.)  However, the ALJ found Plaintiff's subjective "allegations [were] less than fully credible."  (AR 29.)  The ALJ explained that his finding was based on a number of factors including that   Plaintiff "engaged in a somewhat normal level of daily activity and interaction" because she performs personal hygiene, cares for her children, cooks, does basic household chores, and has hobbies.  (AR 30.)  The ALJ also noted that Plaintiff had custody of her grandchild "which can be quite demanding both physically and emotionally" but was able to take care of her grandchild "without any particular assistance."  (AR 30.)  The ALJ found Plaintiff's working after her alleged disability onset date indicated she was not as

limited in her daily activities as she claimed even though this work did not rise to the level of SGA. (AR 30.) The ALJ also found Plaintiff's past work history was sporadic, which made him wonder if her unemployment was due to something other than her medical impairments. (AR 30.)

Finally, the ALJ found in relation to Plaintiff's medical history that Plaintiff's testimony about the side effects from her medications was not supported by office treatment notes. (AR 30.) The ALJ acknowledged that Plaintiff "did undergo three back surgeries for her condition; however, the medical records indicate that this course of treatment repaired the claimant's conditions." (AR 30.) The ALJ noted that "since her last surgery, the claimant has received routine and conservative treatment, primarily in the form of pain medications and physical therapy." (AR 30.) The ALJ also observed that since her last surgery in 2011, Plaintiff had "not received the type of treatment note one would expect" and she had "significant gaps in her treatment." (AR 30.) Consequently, the ALJ found Plaintiff less than fully credible in terms of the disabling effects of her symptoms. (AR 30.)

### D. Applicable Law

Before determining that a claimant's pain or symptom testimony is not credible, an ALJ must make two findings.[5] *Treichler v. Comm'r of SSA*, 775 F.3d 1090, 1102 (9th Cir. 2014). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the

---

[5]    Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p, which required the ALJ to assess the credibility of a claimant's statements. SSR 16-3p focuses on the existence of medical cause and an evaluation of "the consistency of the individual's statements about the intensity, persistence, or limiting effects of symptoms with the evidence of record without consideration of the claimant's overall 'character or truthfulness'." *See* Guide to SSA Changes in Regulations and Rulings 2016-17, June 2017. The revision is not applicable to Plaintiff's application here, because the ALJ rendered his decision on August 10, 2015, before the effective date. (AR 20-39.) But the Ninth Circuit has acknowledged that SSR16-3p is consistent with existing precedent that requires that the assessments of an individual's testimony be focused on evaluating the "intensity and persistence of symptoms" after the ALJ has found that the individual has medically determinable impairments that could reasonably be expected to produce those symptoms. *Trevizo v. Berryhill*, 871 F.3d 664, 678 n.5 (9th Cir. 2017).

pain or other symptoms alleged." *Id.* (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). "Second, if the claimant has produced that evidence, and the ALJ has not determined that the claimant is malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the claimant's testimony regarding the severity of the claimant's symptoms" and those reasons must be supported by substantial evidence in the record. *Treichler*, 775 F.3d at 1102; *see also Marsh v. Colvin*, 792 F.3d 1170, 1173 n.2 (9th Cir. 2015); *Carmickle v. Comm'r, SSA*, 533 F.3d 1155, 1161 (9th Cir. 2008) (court must determine "whether the ALJ's adverse credibility finding . . . is supported by substantial evidence under the clear-and-convincing standard").

In weighing a plaintiff's credibility, the ALJ may consider a number of factors, including: "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony . . . that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). The ALJ must also "specifically identify the testimony [from the claimant that] she or he finds not to be credible and . . . explain what evidence undermines the testimony." *Treichler*, 775 F.3d at 1102 (quoting *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001)). "General findings are insufficient." *Brown-Hunter*, 806 F.3d at 493 (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)).

An ALJ also has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered, even when the claimant is represented by counsel. *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983) (citation omitted). Although the burden to establish disability lies with the claimant, "it is equally clear that the ALJ has a duty to assist in developing the record." *Reed v. Massanari*, 270 F.3d 838, 841 (9th Cir. 2001) (citations omitted). The ALJ's duty to develop the record is triggered "when there is

21

ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-460 (9th Cir. 2001) (citation omitted). The Social Security Administration ("SSA") will attempt to get medical evidence from a claimant's medical sources if given permission and may request and provide for a consultative examination if necessary. *See* 20 C.F.R. §§ 404.1512, 416.912.

If the Appeals Council "considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence." *Brewes v. Comm'r of SSA*, 682 F.3d 1157, 1163 (9th Cir. 2012); *accord Lingenfelter*, 504 F.3d at 1030 n.2. A contradicted treating physician's opinion received into evidence in the first instance by the Appeals Council must still be reviewed and can only be rejected under the specific and legitimate reasons standard. *Ramirez v. Shalala*, 8 F.3d 1449, 1453-54 (9th Cir. 1993).

### E. Analysis

Plaintiff met the first prong of the credibility test because she provided objective medical evidence that the ALJ determined showed that Plaintiff suffered from degenerative disc disease and obesity. (AR 26.) The ALJ provided six reasons for concluding that Plaintiff was not entirely credible concerning the severity of her symptoms. (AR 28-30.)

#### 1. Daily Activities

First, the ALJ pointed to the extent of Plaintiff's daily activities as a basis for discounting Plaintiff's credibility as to her subjective pain testimony. The ALJ found Plaintiff engaged in a variety of daily activities, including performing personal hygiene, grocery shopping, cooking, caring for her children, basic household chores, reading, watching

television, wood carving, spending time with others, driving her children to school, watching her son at his karate lesson, and going to church. (AR 29-30.) Such activities, however, are not of themselves sufficient reasons to reject Plaintiff's pain testimony.

The Ninth Circuit has "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work … will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016 (citations omitted). "The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits … and many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (citations omitted). For Plaintiff's activities to undermine her credibility concerning the disabling effects of her symptoms, they need to be inconsistent with her testimony or transferable to the workplace. *See Garrison*, 759 F.3d at 1016; *Fair*, 885 F.2d at 603.

Plaintiff's activities are not inconsistent with her testimony or transferable to the workplace. Plaintiff testified that she has pain in her back and left leg. She explained that she can sit for approximately 30 minutes and stand for approximately 30 to 60 minutes. (AR 55.) None of her daily activities, as she described them, necessarily conflict with her pain testimony. When she is at home, she can stop doing any activity when she starts experiencing pain. For example, if she was sitting while enjoying her wood carving hobby, she could stop after 30 minutes and stand up to move around or go lie down to take the pressure off of her back. So this activity does not conflict with her pain testimony. This line of reasoning applies to all of her activities. Her church congregation may stand for part of their 45 minute service. Plaintiff may also stand while she watches her son's karate practice. If the ALJ wanted to rely on these activities to refute Plaintiff's testimony, then he needed to ask further questions and elicit answers that showed she could sit for longer or stand for longer than she

claimed.  Plaintiff drives her children to and from school but she said her children's school was three miles away and there is nothing in the record that shows the drive takes more than 30 minutes.  So this activity is also not inconsistent with her testimony.

She did say that her family drove to Arizona for a three-day vacation in December 2014.  (AR 59-60.)  The drive to Arizona would have taken a few hours from Plaintiff's home in the Central District of California.  This activity could potentially have shown inconsistency, but the ALJ did not inquire whether Plaintiff had laid down at any time when she was not driving.  Indeed, the ALJ's RFC accepted that Plaintiff would need to change position once an hour.  (*See* AR 28.)  Without further information, this activity does not refute Plaintiff's pain testimony.  Neither does one medical report that says she had custody of her grandchild in 2013.  (AR 349.)  The one reference is the *only* evidence in the record Plaintiff has a grandchild.  At the hearing in 2015, Plaintiff testified that she lives with her husband and two children.  (AR 54.)  She made no mention of a grandchild and the ALJ did not question Plaintiff about her grandchild or what her child rearing activities entailed.  Thus, there is no evidence to establish that whatever she was or was not doing to care for the grandchild or her own children was inconsistent with her pain testimony.  *See Trevizo v. Berryhill*, 871 F.3d 664, 676, 682 (9th Cir. 2017).  In light of the extensive medical records concerning Plaintiff's three back surgeries, continuing pain following those surgeries, and medication with strong narcotic pain prescriptions, there is nothing in the record that shows Plaintiff's daily activities of living are inconsistent with her testimony or that they are transferable, as she performs them, to the work setting.  Her work activities are discussed below.  Thus, Plaintiff's daily activities are not a clear and convincing reason supported by substantial record evidence to discredit Plaintiff's pain testimony.

\\
\\
\\
\\

## 2.   Part-time Work After Alleged Onset Date

The second reason the ALJ cited was that Plaintiff worked after her alleged onset date. But Plaintiff's work was not considered substantial gainful activity, so her disability benefits application was not foreclosed at Step One of the evaluation process.  (AR 25, 30.)  The "part-time side work" that she performed in 2013 needed to be inconsistent with her testimony or transferable to the workplace in order to bar her receipt of benefits.  *See Garrison*, 759 F.3d at 1016; *Fair*, 885 F.2d at 603.  The ALJ did not elicit any testimony from Plaintiff that the part-time work she did required her to sit or stand for longer than she testified that her back and leg pain would allow.  He also did not show that the work as Plaintiff performed it would be transferrable to the work environment.  Plaintiff working at home for a friend on a freelance basis could well have meant that she was able to set her own schedule and rest as needed.  On this record, it was entirely speculative for the ALJ to conclude this activity provided a basis to find Plaintiff's subjective pain testimony not credible.  Consequently, the Court determines that this second reason for discounting Plaintiff's credibility is neither clear and convincing nor is it supported by substantial evidence in the record.  *See Garrison* 759 F.3d at 1014-1015.

## 3.   Sporadic Work History Prior to Alleged Onset Date

The third reason that the ALJ relied on to find Plaintiff less than fully credibly was Plaintiff's sporadic work history prior to her alleged onset date.  (AR 30).  The ALJ commented, "a review of the claimant's work history shows that the claimant worked only sporadically prior to the alleged disability onset date, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments."  (AR 30.)  Yet, the ALJ did not question Plaintiff about this issue.  While Plaintiff concedes that work history is a "valid consideration" (Joint Stip. at 11), it was wholly speculative for the ALJ to decide on this record that Plaintiff's credibility as to her symptoms was questionable because

a desire to work is not fully substantiated by her income history. Plaintiff has two children and between 2005 and 2011 underwent three major back surgeries. (AR 54; *see also* 307, 324, 333, 489.) As courts in this circuit have noted, "a mother should not be penalized for lack of work history for years spent raising her children." *Aichele v. Astrue*, 2010 WL 1849009 at *6 (E.D. Wash. April 30, 2010); and *see Barron v. Berryhill*, 2017 WL 1054185 at *7 (C.D. Cal. March 20, 2017) ("[T]he ALJ's vague reference to plaintiff's allegedly 'sporadic' work history prior to the 1998 alleged onset date—during which time she was apparently also raising a number of her seven children—and his failure to explain how plaintiff's allegedly 'sporadic' employment prior to the 1998 onset date impacts her 2014 testimony regarding her physical and mental impairments, does not clearly and convincingly detract from her credibility.")

If the ALJ wanted to rely on this reason to show that Plaintiff is not fully credible, then he needed to develop the record regarding her work history and he did not do so. Accordingly, Plaintiff's "sporadic work history" is not a clear and convincing reason supported by substantial evidence in this record that Plaintiff was not fully credible regarding the intensity, persistence, and limiting effects of her symptoms.

### 4. Routine and Conservative Treatment Post-Surgery

The fourth reason the ALJ gave for finding Plaintiff not fully credible was his belief that her treatment was routine and conservative "in the form of pain medications and physical therapy" after her last surgery. (AR 30.) An ALJ may rely on the inconsistency inherent in a Plaintiff reporting symptoms and pain that are disabling but only receiving routine and conservative treatment as a reason to discount a Plaintiff's credibility. *Tommasetti*, 533 F.3d at 1039 (citations omitted). Three back surgeries followed by continued pain management through strong opioid medications, is neither routine nor conservative treatment. Furthermore, the record does not reflect that the surgeries "repaired" Plaintiff's back

impairment as stated by the ALJ. (AR 30.) Rather, after Plaintiff's third surgery, a post-operative follow-up note on September 13, 2011 from Dr. Hopkins listed the surgery as "extremely difficult and the nerve roots are very erythematous and very scarred into the level of her previous surgery." (AR 331.) His treatment at that point included getting Plaintiff a pain management consult because she was still experiencing pain. (AR 331.) The record shows that Plaintiff has been taking strong narcotic pain medications since her last surgery and has repeatedly and consistently reported debilitating pain. She went to physical therapy and it did not help. (AR 52.) She went to a pain management doctor and received "lumbar medial branch blocks and transforaminal epidural injections." (AR 601-03.) At the time of the hearing, she testified she had recently had another MRI and was going to be referred back to a spine specialist. (AR 52, 54, 61-62.) Plaintiff appears to have done everything she could have in terms of complying with the recommended medical treatment, but the records clearly indicate that even her physicians acknowledged that the surgeries were no guarantee that the impairment will be corrected. As such, Plaintiff has not received routine and conservative treatment and this is not a clear and convincing reason to find Plaintiff less than credible.

### 5. Medication Side Effects Not Documented

The fifth reason the ALJ referenced was that the side effects of her medication were not documented in office treatment notes. (AR 30.) Portions of Plaintiff's medical records appear to be missing. (AR 130.) Two treatment records from a pain management doctor, Dr. Iqbal, are included, but it seems that records for appointments between these two appointments are missing, because one reflects an initial consult and the second record references treatment, lumbar medial branch block injections, that already occurred. (AR 595-97, 599-603.) The lack of documentation of side effects of medication could arguably bolster other legally sufficient reasons for discounting Plaintiff's credibility, but none of the ALJ's other reasons have proven to be clear and convincing and adequately supported by the record. Plaintiff testified her pain medications are "1,000 milligram[s] Norco and 350 milligram[s]

Som[a]" both taken three times a day. (AR 52.) Norco, prescribed for moderate to moderately severe pain, is a combination of hydrocodone, an opioid pain medication, and acetaminophen, while Soma is a muscle relaxer.[6] Plaintiff testified to taking naps frequently. Given the nature and amount of medication she regularly takes, her testimony about frequent naps is entirely consistent with her testimony that her medication makes her "tired and sometimes lightheaded." (AR 52.) Standing alone then, a lack of documentation of common side effects of narcotics that Plaintiff testified she experiences is not a clear and convincing reason to discredit her credibility.

### 6. Lack of Doctor's Restrictions and Gaps in Treatment

The sixth reason the ALJ cited for discounting Plaintiff's credibility about the severity of her symptoms and pain was the absence "in the treatment records of restrictions placed on the [Plaintiff] by the treating doctor." (AR 30.) It is the Plaintiff's responsibility to prove she is disabled, which she can do by informing the Agency of, or submitting evidence relating to a host of information including her medical sources. 20 C.F.R. § 404.1512(a)(1). Plaintiff informed the Agency of her medical sources and the Agency contacted her medical sources, but not all of them transmitted Plaintiff's medical records. (AR 130.) As noted above, some of Plaintiff's medical records appear to be missing. The Agency needs a record that is "complete and detailed enough to allow [the Agency] to make a determination or decision" about the nature and severity of impairment, the duration, and the resulting residual functional capacity to determine if Plaintiff is disabled. 20 C.F.R. § 404.1512(a)(2). It is the Agency's responsibility to develop Plaintiff's record. 20 C.F.R. § 404.1512(b)(1). If Plaintiff's medical sources cannot be obtained, the Agency may request a consultative examination. 20 C.F.R. § 404.1512(b)(2).

\\

---

[6] *See* http://www.drugs.com/norco.html; and https://www.drugs.com/soma.html.

Plaintiff testified during the ALJ hearing that she had not seen Dr. Hopkins since 2011. (AR 56.) When Plaintiff's attorney asked during the hearing if a consultative examination would be helpful, the ALJ refused to request one. (AR 50.) A consultative examination was included in the record, but it was from a board eligible (as opposed to certified) internal medicine doctor. (AR 373-78.) It was not from a spine specialist or a neurologist. At the conclusion of the hearing, the ALJ noted that he would hold the record open for thirty days to allow sufficient time to obtain the MRI results and copies of records from the spine specialist Plaintiff was scheduled to see in July, as well as records of any other future appointments. (AR 65.)

Following the ALJ's adverse decision, a Physical Residual Functional Capacity Questionnaire dated December 1, 2015, was provided to the Appeals Council. (AR 671-74.) The questionnaire was completed by "examining provider" J. Lopez and includes a diagnosis and statement that treatment has been ongoing since 2008 with visits approximately every two months for chronic lower back pain. (AR 672-74.) The provider states that Plaintiff suffers from "severe pain, left leg numbness." (*Id.* at 672.) The Court could find nothing in the record that indicates whether J. Lopez was a treating physician or some other type of healthcare professional, but the notes state "medication side effects can make her sleepy, constipated." (AR 674.) This opinion offers some evidence to refute the ALJ's sixth reason to discount Plaintiff's credibility, particularly insofar as the questionnaire indicates specific limitations in Plaintiff's ability to walk only 1 city block without rest or severe pain; to sit or stand only 15 minutes at a time; and that she can sit and stand/walk less than 2 hours in an 8-hour working day. (AR 672.) The Appeals Council made this questionnaire part of the record, but denied review without comment. (AR 6.)

The ALJ could not consider this questionnaire because it was not available at the time of the ALJ's decision. But as it is now part of the record in this action, the questionnaire's contents on initial review do not support the ALJ's determination that Plaintiff was not

credible because of gaps in her treatment or an absence of records indicating specific restrictions imposed by a treating provider.

In sum, none of the reasons provided by the ALJ are clear and convincing reasons supported by substantial record evidence that Plaintiff was not credible concerning the severity of her pain. Consequently, the ALJ's failure to state legally sufficient rationale for discounting Plaintiff's credibility was reversible legal error. The remaining question is whether this case should be remanded for further proceedings or for an award of benefits.

## II.     Remand Is Warranted

Plaintiff requests reversal and an immediate award of benefits. (Joint Stip. at 23.) The Commissioner argues that the ALJ did not err and the decision should be affirmed. (*Id*. at 24.) While the Court finds legal error, for the reasons discussed below, the Court also concludes that this case does not fit the very narrow circumstances where the credit-as-true doctrine justifies an award of benefits. Consequently, remand for further proceedings is appropriate.

When there is legal error and there are outstanding issues to be resolved, the district court should remand the case for further proceedings rather than for an award of benefits. *See Dominguez v. Colvin*, 808 F.3d 403, 407-08 (9th Cir. 2015). If "there are no outstanding issues that must be resolved before a proper disability determination can be made, and where it is clear from the administrative record that the ALJ would be required to award benefits if the claimant's excess pain testimony were credited, we will not remand solely to allow the ALJ to make specific findings regarding the testimony. Rather, we will … take that testimony to be established as true." *Garrison*, 759 F.3d at 1019 (quoting *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1401 (9th Cir. 1988)). For the credit-as-true rule to apply, three elements need to be met: "(1) the record has been fully developed and further

administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020 (citations omitted).

Here, the ALJ's reasons for discrediting Plaintiff's testimony have been shown to be legally insufficient, but the Court is not convinced that if Plaintiff's improperly discredited testimony were credited as true that the ALJ would be required to find Plaintiff disabled within the meaning of the Social Security Act. Specifically, it is unclear whether the ALJ would be required to make a different RFC determination if he properly credited Plaintiff's subjective testimony about her limitations. Further, there is no testimony from the VE about what, if any, other work would be available to Plaintiff based on a new or modified RFC if she experiences the limitations that she alleged. Because Plaintiff's attorney did not pose a hypothetical to the VE that included Plaintiff's alleged limitations, further proceedings are required.

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

**CONCLUSION**

Accordingly, for the reasons stated above, IT IS ORDERED that the decision of the Commissioner is REVERSED AND REMANDED for further administrative proceedings consistent with this Order.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and counsel for defendant.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATE: May 1, 2018

_____
KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE